# In the United States Court of Federal Claims

No. 22-372
(Filed: July 29, 2022)
(Re-Filed: August 10, 2022)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

KGJJ ENGINEERING SOLUTIONS, LLC,

                            *Plaintiff*,

v.

THE UNITED STATES,

                            *Defendant*,

and

BERING GLOBAL SOLUTIONS, LLC,

                            *Intervenor*.

Bid protest; post-award bid protest; experience; affiliates; key personnel; safety; past performance; relevancy; *Blue & Gold*; injunction

* * * * * * * * * * * * * * * * * * * * * * * *

    *Adam K. Lasky,* Seattle, WA, for plaintiff, KGJJ Engineering Solutions, LLC, with whom were *Edward V. Arnold*, *Bret C. Marfut*, and *Ryan C. Gilchrist*, of counsel.

    *Mikki Cottet*, Senior Trial Counsel, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director, for defendant. *Andrew Campos*, Department of the Navy, of counsel.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of the protected material. We have redacted information necessary to safeguard the competitive process. Redactions are indicated by brackets.

*Kenneth A. Martin*, McLean, VA, for intervenor, Bering Global Solutions, LLC, with whom was *William K. Walker*, of counsel.

OPINION

This is a post-award bid protest of the United States Department of the Navy's ("agency's") decision to award a fixed-price and indefinite-delivery, indefinite-quantity contract for facility support services to Bering Global Solutions, LLC ("BGS" or "intervenor"). Plaintiff, KGJJ Engineering Solutions, LLC[2] ("KGJJ" or "protestor"), argues that the agency failed to follow the solicitation's terms in numerous respects and engaged in unequal and arbitrary evaluations of proposals. It seeks a permanent injunction against the agency's decision. The matter is now fully briefed on cross-motions for judgment on the administrative record ("MJARs"). Oral argument was held on July 22, 2022, at the conclusion of which we announced our decision to sustain the protest for the reasons set out below.

BACKGROUND

On July 30, 2021, the agency issued a Request for Proposals ("RFP" or "solicitation") for a firm-fixed price and indefinite-delivery, indefinite-quantity contract for facility support services at two facilities: the Marine Corps Air Ground Combat Center and a Naval Hospital, both located in Twentynine Palms, CA. The facility support services were for eight types of work: Facility Investment, Custodial, Pest Control, Integrated Solid Waste Management, Grounds Maintenance and Landscaping, Pavement Clearance, Water, and Environmental. The contract was to be an 8(a) small business set-aside. The contract period is for twelve months, with seven twelve-month options and one six-month option period. Proposals were due September 22, 2021. The solicitation was amended eleven times.[3]

---

[2] "KGJJ is an 8(a) joint venture formed under the U.S. Small Business Administration's Mentor-Protégé program between King & George, LLC ['King & George'] (protégé member) and J&J Maintenance, Inc., *d/b/a* J&J Worldwide Services ['J&J'] (mentor member)." Pl.'s MJAR at 2.

[3] References to the solicitation are to the tenth amended solicitation.

2

## I.      Evaluation Scheme

Proposals were to be evaluated based on six factors: Price, Experience, Technical Approach, Management Approach, Safety, and Past Performance.[4]  All non-price factors combined were equal in importance to price.  Past Performance was equal in importance to all other non-price factors combined. Each non-price factor would be rated adjectively.  The non-price factors, aside from Past Performance, would be rated as Outstanding, Good, Acceptable, Marginal, or Unacceptable.[5]  Past Performance would be rated as Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, or No Confidence. Past Performance's importance to this solicitation, according to the agency, "require[d] a greater level of discrimination within the past performance evaluation," necessitating its more detailed rating scale.  AR 526.  Ratings would be determined "through an assessment of the strengths, weaknesses, significant weaknesses, deficiencies, and risk of a proposal."  AR 523.  A deficiency was a "material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."  *Id.* at 524.

Experience was to be evaluated based on an offeror's "demonstrated experience and depth of experience in performing relevant projects" and the recency of those projects.  AR 528.  Offerors could receive higher ratings in Experience if their projects met certain criteria ("bonus criteria").  For example, offerors could receive higher ratings if they demonstrated work experience in Facilities Investment, Custodial, or Water as a prime contractor in relevant projects.[6]  *Id.* at 528–29 (listing the criteria that could result in higher Experience ratings for offerors).

---

[4] The evaluation criteria of Technical Approach and Management Approach are not at issue.

[5] If an offeror's proposal received an Unacceptable rating in a factor, it was considered "unawardable."  AR 524.

[6] Facilities Investment, Custodial, and Water represented a large portion of the expected work under this contract, according to the Independent Government Estimate.

Offerors were to submit a minimum of two prior projects and a maximum of four projects for the agency to evaluate. Notably, the RFP stated that "[t]he Government will not consider any project submitted for experience that was performed by a firm other than the Offeror." AR 517. The RFP also contained an exception to that limitation, allowing the government to:

> [C]onsider otherwise relevant projects performed by parent or subsidiary companies, predecessor companies, or satellite offices (i.e. any office(s) of the Offeror other than the one submitting the current proposal) of the Offeror, provided the Offeror's proposal clearly explains how the offered experience will be effectively utilized in the performance of the solicited contract.[7]

*Id.* Offerors were to submit their prior project experience using a standard form ("Exhibit B"). This form, however, allowed the offeror to check an additional box for the experience of "Key Personnel." While the RFP itself did not offer "key personnel" as an additional exception and Exhibit B referred back to the RFP for evaluation information, the agency's responses to Requests for Information ("RFIs") indicate that projects performed by key personnel under Exhibit B of the Experience factor would be considered.[8]

---

[7] The RFP also contained an exception for joint ventures and first-tier small business subcontractors, which are not relevant to our discussion of the protest.

[8] When asked whether offerors could submit projects of key personnel under Experience, the agency responded, "Per FAR 15.305(a)(2)(iii), 'The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition.'" AR 417. Although the FAR paragraph cited pertains to past performance, the fact that the agency quoted it in response to a question about Experience informs us that the agency intended it to apply to Experience as well. Further, when an offeror asked about the process of submitting key personnel experience, the agency answered the question rather than saying that key personnel experience was not permitted. AR 497.

For Safety, the agency sought "to determine that the Offeror has consistently demonstrated a commitment to safety." AR 531. Safety would be evaluated based on "[t]he Days Away from Work, Restricted Duty, or Job Transfer (DART) Rate; and Total Case Rate (TCR) for [Calendar Years 2016 – 2020], as well as a safety narrative."[9]  AR 520.  The rates would be evaluated for their risk levels (i.e., Very High Risk, High Risk, Moderate Risk, Low Risk, Very Low Risk), and the agency would "determine if the Offeror . . . has demonstrated a history of safe work practices."  AR 531.  The RFP stated that, for both rates, "[d]eclining trends that push the risk levels from Moderate Risk (MR) or higher to Low Risk (LR) or Very Low Risk (VLR) would indicate a strength." *Id.* at 531–32.

Finally, Past Performance would be evaluated based on three elements: recency, relevancy, and quality.  Relevancy would be evaluated based on the similarity of the scope, magnitude, and complexity of the submitted projects to the work that would be performed under the solicitation. Relevancy would also receive its own rating: Very Relevant, Relevant, Somewhat Relevant, or Not Relevant.  This focus on relevancy was necessary, according to the RFP, because "[t]his source selection requires a greater level of discrimination within the past performance evaluation." AR 526.  Quality was not separately evaluated, instead being rolled into the final Confidence rating.  Contractor Performance Assessment Reporting System ("CPARS") evaluations or Past Performance Questionnaires ("PPQs") were, however, required for each submitted project, and they indicated performance evaluations for these prior projects.  The offeror was to submit the same projects for Past Performance as it did for Experience.

## II.    Evaluations and Award

Nine offerors submitted proposals.  All of the offers initially were deemed unacceptable, after which the agency held discussions with all of the offerors.  The offerors then submitted proposal revisions on December 28,

---

[9] For the DART rate, the solicitation states, "DART cases include injuries or illnesses resulting in death, days away from work, and/or restricted work or transfer to another job days beyond the day of injury/illness." AR 520.  For the TCR, the solicitation states, "TCR cases include injuries or illnesses resulting in death, days away from work, restricted work or transfer to another job days beyond the day of injury/illness, medical treatment beyond first aid, or loss of consciousness." *Id.* at 521.

2021, and then final proposal revisions on February 8, 2022.  The Source Selection Evaluation Board ("SSEB") then analyzed each offeror's proposal.

Under Experience, KGJJ and BGS both received an Outstanding.  The following chart contains the SSEB's findings concerning KGJJ's bonus criteria.  The horizontal axis reflects the projects offerors submitted, while the vertical axis reflects the bonus criteria the agency was evaluating for each project:

|  | Project 1 [*****] | Project 2 [*****] | Project 3 [*****] | Project 4 [*****] |
|---|---|---|---|---|
| **RATED HIGHER** | | | | |
| **Paragraph (ii)(a):** Offeror demonstrated experience as a prime contractor in both 1502000 – Facilities Investment and 1503010 – Custodial on two (2) or more relevant projects. | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(b):** Offeror demonstrated experience as a prime contractor for The Joint Commission (TJC) and/or its equivalent under 1503010 – Custodial on one (1) or more relevant projects. | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(c):** Offeror demonstrated experience as a prime contractor for 1606000 – Water (operations, maintenance, and repair) on one (1) relevant project. | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(d):** Offeror submitted two (2) or more relevant projects as a prime contractor where they self-performed at least 65% of the work (as defined by dollar value). | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(e):** Offeror submitted two (2) or more relevant projects as a prime contractor with a period of performance of one (1) full year with a funded value of $8 million or more. | [*****] | [*****] | [*****] | [*****] |
| **RATED LOWER** | | | | |
| **Paragraph (ii)(o):** Offeror failed to properly complete Exhibit B. | [*****] | [*****] | [*****] | [*****] |

AR 3782.  The following chart contains the SSEB's findings on BGS:

6

| | Project 1 [*****] | Project 2 [*****] | ~~Project 3~~ [*****] | Project 4 [*****] |
|---|---|---|---|---|
| **RATED HIGHER** | | | | |
| **Paragraph (ii)(a):** Offeror demonstrated experience as a prime contractor in both 1502000 – Facilities Investment and 1503010 – Custodial on two (2) or more relevant projects. | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(b):** Offeror demonstrated experience as a prime contractor for The Joint Commission (TJC) and/or its equivalent under 1503010 – Custodial on one (1) or more relevant projects. | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(c):** Offeror demonstrated experience as a prime contractor for 1606000 – Water (operations, maintenance, and repair) on one (1) relevant project. | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(d):** Offeror submitted two (2) or more relevant projects as a prime contractor where they self-performed at least 65% of the work (as defined by dollar value). | [*****] | [*****] | [*****] | [*****] |
| **Paragraph (ii)(e):** Offeror submitted two (2) or more relevant projects as a prime contractor with a period of performance of one (1) full year with a funded value of $8 million or more. | [*****] | [*****] | [*****] | [*****] |
| **RATED LOWER** | | | | |
| **Paragraph (ii)(o):** Offeror failed to properly complete Exhibit B. | [*****] | [*****] | [*****] | [*****] |

AR 3768.  Overall, KGJJ's four submitted projects met more of the bonus criteria than did [*****], mainly in areas concerning the most relevant work.

BGS's submitted projects were not performed by itself but by three of its sister companies.[10]  Work by sister companies was not included within the

---

[10] The three sister companies were [*****].  The common parent of BGS and its sister companies was Bering Straits Native Corporation ("BSNC").

exceptions permitted in the RFP for experience.  In Exhibit B to its proposal with respect to Factor 1, Experience, BGS identified key personnel, [*****], as providing BGS's experience.[11]  Mr. [*****] is "[*****]."  AR 3517.  Mr. [*****] is [*****] of BGS and [*****] of the three sister companies, where BGS claims that he was "ultimately responsible" for the three sister companies' contract performance and would be for this contract as well.  AR 3517.  Mr. [*****] is [*****] of BGS and its sister companies, where he "manag[ed] the Phase-In Process, perform[ed] quality assurance, coordinat[ed] corporate resources, and support[ed] the Program Manager in contract execution" during the sister companies' contracts and would do so for BGS under the contract at issue.  *Id.*  Notably, Mr. [*****] and Mr. [*****] were not listed as key personnel in BGS's organizational chart, which it had to submit in response to questions related to Factor 2, Technical Approach.  AR 3538.  Further, when BGS identified its key personnel by name and discussed their qualifications, Mr. [*****] and Mr. [*****] were neither identified nor discussed.  *See* AR at 3545–3548.

Under Safety, both BGS and KGJJ received Acceptable ratings.  Neither received any strengths for this aspect of their proposals.  Both BGS and KGJJ consistently had relatively low risk levels for their rates.  The following chart reflects BGS's safety rating information:

| Safety Data Submitted for Factor 4 | | | | |
|---|---|---|---|---|
| Reference | Criteria | Proposal Data | | Analysis |
| **Paragraph** (i)(a) | OSHA Days Away from work, job transfer, or Restriction Rate (DART) | **DART per year** | | **Risk level** |
| | | 2016 | [*****] | N/A |
| | | 2017 | [*****] | Very Low Risk |
| | | 2018 | [*****] | Very Low Risk |
| | | 2019 | [*****] | Low Risk |
| | | 2020 | [*****] | Low Risk |
| **Paragraph** (i)(b) | Total Case Rate (TCR) | **TCR per year** | | **Risk level** |
| | | 2016 | [*****] | N/A |
| | | 2017 | [*****] | Very Low Risk |
| | | 2018 | [*****] | Very Low Risk |
| | | 2019 | [*****] | Very Low Risk |
| | | 2020 | [*****] | Very Low Risk |

---

[11] BGS also identified other BSNC personnel and departments that would be supporting this project.

AR 3863.  The following charts reflect KGJJ's safety rating information. The first chart contains the rates of the protégé member, King & George:

| Safety Data Submitted for Factor 4 | | | |
|---|---|---|---|
| Reference | Criteria | Proposal Data | Analysis |
| | | DART per year | | Risk level |
| Paragraph (i)(a) | OSHA Days Away from work, job transfer, or Restriction Rate (DART) | 2016 | ***** | Very Low Risk |
| | | 2017 | ***** | Very Low Risk |
| | | 2018 | ***** | Very Low Risk |
| | | 2019 | ***** | Low Risk |
| | | 2020 | ***** | Very Low Risk |
| Paragraph (i)(b) | Total Case Rate (TCR) | TCR per year | | Risk level |
| | | 2016 | ***** | Very Low Risk |
| | | 2017 | ***** | Very Low Risk |
| | | 2018 | ***** | Very Low Risk |
| | | 2019 | ***** | Very Low Risk |
| | | 2020 | ***** | Very Low Risk |

AR 3873.  The second chart contains the rates of the mentor member, J&J:

| Safety Data Submitted for Factor 4 | | | |
|---|---|---|---|
| Reference | Criteria | Proposal Data | Analysis |
| | | DART per year | | Risk level |
| Paragraph (i)(a) | OSHA Days Away from work, job transfer, or Restriction Rate (DART) | 2016 | ***** | Very Low Risk |
| | | 2017 | ***** | Very Low Risk |
| | | 2018 | ***** | Low Risk |
| | | 2019 | ***** | Very Low Risk |
| | | 2020 | ***** | Very Low Risk |
| Paragraph (i)(b) | Total Case Rate (TCR) | TCR per year | | Risk level |
| | | 2016 | ***** | Very Low Risk |
| | | 2017 | ***** | Very Low Risk |
| | | 2018 | ***** | Very Low Risk |
| | | 2019 | ***** | Very Low Risk |
| | | 2020 | ***** | Very Low Risk |

*Id.*

Under Past Performance, BGS and KGJJ, along with all other offerors, save one, received Substantial Confidence ratings.  The SSEB's reasoning for its ratings was repeated essentially verbatim for all offerors receiving a Substantial Confidence rating:

> [The projects] reviewed by the Government demonstrated a pattern of successful completion of tasks; a pattern of deliverables that are timely and of good quality; a pattern of cooperativeness and teamwork with the Government at all levels; and the recency of tasks performed are similar to the work requirements in the solicitation.

AR 2874.  As plaintiff points out, this conclusion was reached despite the fact that the agency evaluated the relevancy of projects and found varying levels of relevance under Experience.

All offerors' submitted projects were found to be either Very Relevant or Not Relevant.  In total, 21 projects were rated as Very Relevant.  The only explanation given by the SSEB for its relevance ratings was repeated verbatim for each offeror: "[T]asks performed are *similar to* work requirements in the solicitation."  *E.g.*, AR 2570 (emphasis supplied). Further, although quality was not separately rated, CPARS evaluations and PPQs for the offerors' projects indicated varying levels of satisfaction with the offerors' respective performances.

Overall, the SSEB rated BGS's offer as having the best value to the government.  It received the top technical ranking, and its price was third lowest.[12]  KGJJ, on the other hand, had the second-highest overall ranking. It had the third-highest technical ranking and fourth-lowest price.[13]  The SSEB found BGS's proposal to be worth the relatively modest price premium and recommended award to BGS.  The Source Selection Authority agreed with the SSEB's evaluation and awarded the contract to BGS.

On March 31, 2022, KGJJ protested the agency's award decision.  The government filed the administrative record, and the parties submitted their cross-motions for judgment on the administrative record.  The motions are fully briefed, and oral argument was held on July 22, 2022.  After argument, we granted the protestor's motion and denied the government's and intervenor's motions.  Judgment was deferred pending this opinion.

## DISCUSSION

We review bid protests in accordance with the standards laid out in the Administrative Procedure Act.  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing 28 U.S.C. § 1491(b)(1) (1996)). Unless the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," we will not interfere

---

[12] The lowest price came from an offeror whose proposal was unacceptable. The second-lowest price was 0.64% lower than BGS's price.

[13] KGJJ's price was 0.39% higher than BGS's.

with them. 5 U.S.C. § 706(2)(A) (2018).  Moreover, an agency's error is not enough by itself to merit relief; that error must also be prejudicial to the protestor.  *Office Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020) (citing *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013)).  "To establish prejudicial error, a protestor must show that but for that error, the protestor had a substantial chance of receiving a contract award."  *Id.* at 1373–74 (citing *Alfa Laval Separation, Inc. v. United States* 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

KGJJ presents multiple grounds of protest.  First, it argues that the agency, contrary to the terms of the solicitation, accepted the experience of BGS's sister companies under the first factor, Experience.  KGJJ also attacks the agency's evaluation of the Safety factor.  KGJJ contends that the agency did not evaluate its safety narrative for strengths and essentially evaluated all offers on a pass/fail basis, contrary to the terms of the solicitation.  The protestor also argues that the agency did not evaluate its DART rate and TCR reasonably or in accordance with the solicitation's terms.

KGJJ next turns its focus to the agency's evaluation of Past Performance.  KGJJ contends that the agency unreasonably, and in violation of the terms of the solicitation, assigned all offerors' relevant projects ratings of "Very Relevant."   KGJJ also argues that the agency unreasonably assigned offerors a "Substantial Confidence" rating for Past Performance despite varying quality of offerors' prior performance.  Finally, KGJJ argues that the agency did not adequately document its best value decision and rationale, instead relying solely on adjectival ratings.  KGJJ seeks to enjoin the award to BGS.  We agree with plaintiff's arguments concerning the agency's evaluation of the Experience and Past Performance factors.  We also find arbitrary the agency's evaluation of risk levels under Factor 4, Safety, but we are unpersuaded that it prejudiced the protestor.  We take each of plaintiff's arguments in turn.

## I.   Experience

KGJJ's first argument is that the agency should not have credited BGS with its sister companies' experience, as the solicitation specifically limited consideration to prior work of the offeror itself.   Although there were

exceptions, none permitted the consideration of projects performed by sister or affiliate companies, according to KGJJ.[14]

The government and BGS argue that the solicitation should be read to permit consideration of work done by "affiliate companies" and the experience of key personnel shared by the offeror and other companies. Thus, the agency did nothing wrong in considering the experience of intervenor's sister companies, per the government. We agree with the protestor.

### A. Affiliate Company Experience

The government and BGS offer multiple reasons why projects performed by affiliates were properly accepted under the Experience factor. First, they both argue that reliance on the work of affiliate companies was not explicitly precluded by the solicitation and that, in the absence of such an explicit exclusion, prior decisions suggest affiliate company experience can be considered. They also point to the fact that information about affiliate companies had to be submitted under the Price and Past Performance factors. The government also argues that, because BGS's sister companies had teaming agreements with BGS for this project, the solicitation should be read to permit consideration of their experience. Finally, both parties argue that there was a patent ambiguity in the solicitation, and KGJJ should have brought a pre-award protest to challenge the solicitation's terms.[15] KGJJ responds that none of the government's or intervenor's arguments can be squared with the terms of the solicitation. We agree with KGJJ.

---

[14] The parties are in general agreement that affiliate companies would include sister companies.

[15] BGS also presents separate arguments on the issue. It argues that the exception for subsidiaries referred to the parent company's subsidiaries, not the offeror's. It further contends that not allowing affiliate company experience is unduly restrictive of competition. We are unconvinced by these arguments. The solicitation contains no indication that "subsidiary" meant subsidiaries of the parent of the offeror. Further, if a term was unduly restrictive of competition, BGS was required to protest that term before proposals were due. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

The government and intervenor are correct that, in general, an agency is free to consider the experience of an offeror's parent, subsidiary, or affiliated companies unless there is an express exclusion in the solicitation. *Femme Comp Inc., v. United States*, 83 Fed. Cl. 704, 746 (2008) (quoting *Hot Shot Express, Inc.*, B-290482, 2002 C.P.D. ¶ 139, 2002 WL 1831022 (Aug. 2, 2002).

Here, however, the solicitation begins with an express exclusion of experience from any entity other than the offeror: "The Government will not consider any project submitted for experience that was performed by a firm other than the Offeror."  AR 517.  There are exceptions allowed—first-tier small business subcontractors, joint ventures, parent companies, subsidiary companies, predecessor companies, or satellite offices of the offeror—but there is no exception for work done by affiliate or sister companies. *Id.* at 516–17.  The solicitation did not need to go further to explicitly single out affiliate company experience for exclusion.

It is not inconsistent that offerors were required by the Price and Past Performance factors to submit certain information from affiliates if those affiliates would be working on the project or supporting the offeror during the project.  This information included the affiliates' DUNS Number and CAGE Code.[16]  This is because, under the Past Performance factor, the solicitation stated that the agency reserved the right to review affiliate past performance information using the DUNS Numbers and CAGE Codes provided under the Price factor.  Requiring information to evaluate affiliates' past performance is routine but it does not thereby expand what constitutes qualifying experience under Factor 1.

The government's assertion that BGS's sister companies were members of BGS's "team" and therefore were properly considered for supporting the offeror's experience is incorrect.  Although affiliates supporting the offeror's performance were referred to as "Team Members" in the Price and Past Performance factors, the Definitions subsection of the solicitation describes Experience as "[p]ertain[ing] to work performed by an Offeror and Offeror's Team."  AR 524.  That section in turn specifically defines "Offeror's Team" as the offeror and its "first-tier small business subcontractor(s) *only*."  *Id.* (emphasis added).  Nowhere in the solicitation

---

[16] The DUNS Number and CAGE Code allow the government to identify vendors and review their performance information.

does it state that an affiliate's experience will be considered, either by itself or as a member of the offeror's team.

Lastly, the government's and BGS's argument that KGJJ waived the right to challenge the agency's inclusion of BGS's affiliates' experience fails for two reasons. First, there was no patent ambiguity. KGJJ's reading of the limitations of the solicitation are correct. In addition, however, KGJJ was under no obligation to anticipate, much less know about the agency's convoluted justification for including BGS's other experience

### B.  Key Personnel

The government also argues that BGS properly submitted and the agency properly credited the experience of its shared key personnel for the Experience factor. It contends that the option to check the key personnel "box" on Exhibit B created an additional exception, allowing offerors to submit contracts on which the offeror's key personnel had worked.[17] Indeed, BGS, in filling out Exhibit B, listed the experience of Mssrs. [*****] and [*****], individuals it characterized as key personnel because of their work as executives of the parent company of both BGS and its sister entities.

KGJJ responds that the inclusion of a box labeled "Key Personnel" on Exhibit B could not create a separate exception given the explicit limiting language of the solicitation itself and the reference back to that language in Exhibit B. It is unnecessary for us to resolve the question,[18] however, because, as KGJJ points out, BGS played fast and loose with its use of the term "Key Personnel." Offerors were required in the Technical Approach and Management Approach Factors to explicitly identify their key personnel, and BGS did not list Mr. [*****] or Mr. [*****]. The solicitation offers examples of key personnel as project managers, on-site supervisors, quality control managers, site safety and health officer, and environmental/energy manager, and offerors could add others. High level executives like Mssrs. [*****] hold very different positions, and, in any event, BGS did not include

---

[17] The government also argues that the presence of this box means the exceptions in the solicitation are illustrative, not exhaustive. Given the explicit limitations in the solicitation, this argument is unconvincing.

[18] Although inconsistent with the language of the solicitation, the RFIs in the administrative record show that the agency meant to include the box and intended offerors to use key personnel experience if they wished.

them in its management chart, which clearly indicates which personnel were "key."    Under Technical Approach, an offeror had to submit an organizational chart that identified its key personnel.  BGS's organizational chart had Mr. [*****] and Mr. [*****] on it, but it did not list them as key personnel, a term of art in procurement.  When it identified its key personnel by name later and expounded upon their qualifications, Mr. [*****] and Mr. [*****] were again not included.  BGS did not consider them key personnel and neither do we.

The agency should not have considered the experience of BGS's sister companies or that of Mr. [*****] or Mr. [*****].    Because the only experience BGS submitted was that of its sister companies, it did not meet the minimum number of necessary projects and should have been excluded from the competition.

## C. Prejudice

Excluding BGS from award consideration would have given KGJJ a substantial chance of receiving the award.  KGJJ was rated the second overall offeror, behind BGS.  It had the third-highest technical ranking and fourth-lowest price (only .39% higher than BGS's price).  KGJJ, therefore, would have a substantial chance for award after BGS's exclusion.

## II.    The Safety Factor

KGJJ also makes the independent argument that the agency erred in its evaluation of the safety factor by only assigning strengths if an offeror's DART Rate and Total Case Rate risk levels decreased during the relevant time period.  The agency promised to evaluate the rates for whether the offeror had a "demonstrated a commitment to safety."  AR 531.  Only assigning strengths for decreases in those risk levels, as opposed to crediting offerors such as KGJJ with a strength for consistently maintaining low risk levels during the entire relevant period, is inconsistent with the advertised focus on safety.  BGS and the government respond that the agency was acting consistently with the solicitation, which only promised a strength in the event an offeror showed decreasing risk levels.

We are sympathetic with plaintiff's argument.  It seems irrational to limit award of a strength to entities which had poor but decreasing risk levels when others were consistently in the lowest risk category, and KGJJ is correct that the solicitation does not bind the agency's hands in that respect.

In the final analysis, however, we are not convinced that KGJJ can show prejudice.  KGJJ is not the only offeror with low risk ratings.  Other offerors, including BGS, also consistently had low risk levels.  KGJJ has not shown how a proper Safety evaluation would lead to KGJJ having a substantial chance at receiving award.  In any event, we need not resolve the issue, as other problems with the solicitation exist.

### III.   Past Performance

Lastly, KGJJ argues that the agency made errors in its Past Performance evaluation.  First, it argues that the agency unreasonably assigned Very Relevant ratings to all submitted projects, even if they were merely "relevant" by the agency's standard.  Next, it argues that the agency then compounded the error by unreasonably assigning a Substantial Confidence rating to each offeror despite varying levels of quality of performance in the offerors' submitted projects.  We take these arguments in turn.

#### A.  Very Relevant Ratings

KGJJ presents three arguments as to why the agency erroneously assigned a Very Relevant rating to all merely "relevant" projects.  First, it points out that the SSEB's evaluation mistakenly characterized all offerors' submitted projects as Very Relevant when they were merely "similar to the work requirements in the solicitation."  *E.g.*, AR 3892.  This was the agency's own requirement to achieve a Relevant rating, not Very Relevant, which required that the work had to be "essentially the same" as the contracted work.  AR 526.  KGJJ then argues that it was particularly irrational to find that that every project deserved the same rating when, in evaluating the Experience factor, the agency had found that the submitted projects, common to both factors, displayed widely varying levels of relevance.  Third, KGJJ contends that the agency did not consider a project's magnitude or complexity during relevance determinations.

The government and intervenor urge us not to dive into what they characterize as the minutiae of the evaluation process because of the great deference we owe the agency in evaluating an offeror's past performance.  And the government adds that application of the wrong definition was harmless error, as it affected every offeror.  There are limits to deference, however, and we draw the line at irrationality.  *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 129 (2021).

Despite the much-touted importance the agency claimed to place on distinguishing degrees of relevant past performance, there is no indication that the agency actually evaluated or distinguished the relevancy of projects. The only assessment of relevance, repeated verbatim in each offeror's evaluation, was that the work performed "was similar to the work requirements in the solicitation." *E.g.*, AR 3892. There was no mention of complexity or magnitude. While BGS argues that the agency already considered magnitude and complexity under Experience, BGS does not point to how the agency applied those findings when evaluating the relevancy of specific projects.[19]

Further, the ratings for the projects under relevancy are inconsistent with the relevancy findings under Experience. Relevancy under both factors was evaluated for the same qualities: scope, complexity, and magnitude.[20] The Experience evaluation showed that not all of the projects the offerors submitted met all of the Experience bonus criteria. Projects offered by BGS and other offerors, for example, did not meet certain bonus criteria for the most relevant types of work performed. Yet, despite these differences in relevancy findings under Factor 1, all projects deemed relevant were rated as Very Relevant under Factor 5. Although the findings in Experience were based on bonus criteria, they show that there were differentiators in relevancy among projects. The agency made no attempt to reconcile these differences or explain how projects with very different relevancy treatment under Factor 1 nevertheless all lead to a collective "Very Relevant" rating under Factor 5.

While agencies do have a large amount of deference in making past performance determinations, that deference is not unlimited. The agency specifically said that for this contract, relevancy was important enough to necessitate its own rating scale so that the agency could accurately differentiate between offerors. While the projects could have all been Very

---

[19] As plaintiff mentions, the Experience bonus criteria showed differences in projects' magnitude. Further, although intervenor argues that the assignment of strengths and weaknesses under Experience showed the agency considered magnitude, scope, and complexity of projects, plaintiff argues, and we agree, that the strengths and weaknesses considered offerors' projects collectively, while projects had to be evaluated for relevance individually under Past Performance.

[20] "Magnitude" was referred to as "Size" under Experience. AR 527.

Relevant, the evaluation does not reflect how the agency came to that conclusion. There is no indication that the agency truly evaluated relevancy, and the discrepancies between relevancy under Experience and relevancy under Past Performance are jarring and unexplained. Therefore, we find that the agency acted unreasonably in its evaluation of relevancy in Past Performance.

### B.  Quality and Past Performance Rating

KGJJ then argues that the agency unreasonably evaluated Past Performance overall. It contends that the agency irrationally assigned a Substantial Confidence rating to all offerors despite varying levels of quality in their submitted projects. Again, both the government and BGS merely caution that we should not delve into the minutiae of the Past Performance evaluations. We agree with the protestor.

The agency did not properly evaluate Past Performance. The solicitation stated, along with relevance, that the evaluation of Past Performance necessitated a rating scale that would allow for discrimination between offerors. Once again, as with relevance, this importance was cast aside during evaluation. The agency gave every offeror, save one, a Substantial Confidence rating despite varying levels of quality of performance on past projects. For example, BGS and other offerors received satisfactory ratings in some projects, while other offerors received only Very Good or Exceptional ratings. Perhaps all offerors did deserve Substantial Confidence ratings, and the quality ratings could be offset by other considerations. The administrative record, however, shows no effort from the agency to wrestle with these differences, nor does it show how the agency concluded that every offeror was entitled to the same rating. The agency merely repeated the same justification essentially verbatim for all offerors, despite the fact that, according to the solicitation, Past Performance was the most important non-price factor, indeed prompting adoption of tailored rating systems to substantively differentiate offerors. Yet, the agency treated the factor in a cursory manner and therefore acted unreasonably.

### C.  Prejudice

If the agency had evaluated Past Performance reasonably, there is a substantial chance KGJJ would have received award. KGJJ was rated the second-highest overall offeror, and Past Performance, as the most important non-price factor, could greatly affect the outcome of the solicitation. KGJJ's

projects met several bonus criteria for relevance under Experience, making it likely that those projects would retain high relevancy scores under Past Performance.  Further, it received exclusively Very Good and Exceptional ratings for its projects.  A proper evaluation of Past Performance might have resulted in other offerors being downgraded due to decreases in relevance ratings or quality considerations, allowing KGJJ to receive the award.

## IV.   Injunctive Relief

The court must consider four factors before granting injunctive relief:

"(1) [W]hether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, U.S. 531, 546 n.12 (1987)).  KGJJ argues that all factors favor granting permanent injunction.  We agree.  As discussed above, KGJJ succeeded on the merits.  We, therefore, consider the rest of the factors.[21]

For the second factor, KGJJ argues that it would suffer irreparable harm if it could not fairly compete for this contract.  It contends that the loss of potential revenue and profits from being unable to fairly compete for this procurement is an irreparable harm and that bid preparation costs are not an adequate remedy for this harm.  The government and BGS do not argue otherwise. We agree with the protestor.  Although the contract's revenue and profits themselves are remote, given that award to the protestor is not assured, the loss of opportunity to compete is sufficient harm to support an injunction.

For the third factor, KGJJ contends that the balance of hardship between the parties also favors injunctive relief.  It argues that most of the work within the scope of this contract is currently being performed by other

---

[21] Neither the government nor BGS dispute KGJJ's arguments concerning the rest of the factors.

contractors through contracts that will not expire until 2023 or 2024.[22]  The government does not suggest that it would suffer any independent harm if a permanent injunction was entered, and so we agree with plaintiff.  The government indicated in our initial status conference that it would stay contract performance insofar as it related to this protest until August 31, 2022.  The balance of hardships clearly favors plaintiff.

Finally, for the fourth factor, KGJJ argues that it is in the public interest to grant injunctive relief.  Correct application of procurement laws, according to KGJJ, would benefit the public interest. We agree.  The public has an obvious interest in fair and lawful procurements.  The public interest favors an injunction.

CONCLUSION

The agency acted unreasonably in awarding the contract to BGS.  The awardee should not have been considered due to its inclusion of affiliate projects under the Experience factor.  Further, the agency unreasonably evaluated Past Performance and project relevancy, and it did not properly document its conclusions.  The four factors weigh in favor of granting injunctive relief.  Plaintiff's motion for judgment on the administrative record is thus granted, and defendant's and intervenor's cross-motions are denied.  Accordingly, the following is ordered:

1. The agency is hereby enjoined from proceeding with performance of the contract awarded to the intervenor.[23]

2. Assuming the agency moves forward with the solicitation, it will do so consistently with the terms of this opinion.

3. The Clerk of Court is direct to enter judgment for plaintiff.

4. Costs to plaintiff.

---

[22] Part of the work has been transferred to BGS, according to plaintiff, who argues that a bridge contract would be sufficient if an injunction were to be entered.  The government makes no argument otherwise.

[23] The sealed opinion contained an error in the injunction.  This public opinion has been edited to correct the error.  *See* ECF No. 49.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge